We shall show by records from North Carolina that the recitals in the grant are false. We wish to show by those records that, instead of ten pounds being paid, as stated in the grant, this grant actually issued on county or fifty-shilling warrants; and besides that those warrants had previously passed into grants. We do not contend but that a grant is primâ facie good, and it lies on the defendant to show that it is bad. The laboring oar is with us. If we cannot show this grant is void for misrecitals or fraud, every species of fraud will be patronized. Suppose military warrants were granted within John Armstrong's bounds, or vice versa, such grants would surely be void, as not being authorized by law. It is my wish to show, if permitted by the Court, that all the warrants referred to in the plaintiff's patent were previously granted. This grant is founded on Carter's warrants, and the court cannot err in permitting the evidence offered, because they are numbered in numerical series; and thus it can be easily discovered whether those warrants had passed into grants previous to the emanation of the plaintiff's grant.[1] *Page 27 
WHITESIDE, e contra. — The defendant has not shown any title in himself, and the Court will not permit a mere naked possessor to examine the grounds of the plaintiff's title. There is no law or practice which would authorize a defendant, standing in such a situation, to contend against a title. The law of England respecting misrecitals relates to false suggestions of the person procuring a grant. On the face of this grant there is not one statement which is from the information of the grantee. The grant either expresses the words of the State founded on its own knowledge, or the survey of one of its officers. It therefore results that the grantee cannot be prejudiced by such misrecitals. Carter's or any of the county warrants might be surveyed anywhere within John Armstrong's bounds, in the Eastern, Western, or Middle District. Such has been the practice, and many thousand grants have been procured on those warrants for lands lying within the limits originally allotted for John Armstrong's warrants by the Acts of 1783, c. 2, and April 1784, c. 14. It has long since been made a question whether such surveys and grants were good, and decided that they were. Whatever might be the effect of these arguments he could not pretend to say, but he felt well assured that the defendant ought to acquire an interest from the State before he would be permitted to contend.
HAYWOOD, in reply. — It is said, an attempt of this kind never was made. I do not know what has been attempted, nor do I know that such a case as this ever occurred before, to give rise to such an attempt. But it is believed, whether attempted or not, the ground taken is a legal one, and the possessor can as well contend without as with a title. Let those opposed to me show there is a distinction, If our acts on the subject of appropriating vacant lands, or the common law is to govern, he could show that the plaintiff's grant was void. Perhaps there never was such a case as this. It is certain no instance of a more flagitious fraud ever did occur. Instead of 32,000 acres, which the grant calls for, there are within the bounds of the claim 69,000 acres granted; and all this, too, on warrants previously granted. *Page 28 
Confident in the principles of law and justice, I shall boldly contend for their rights. If there be false suggestions in a grant, they will render it void, and it is of no consequence from what quarter the suggestions come. This I can prove from principles of the common law, and decisions, the authority of which is unquestionable. If this were the case of an individual, he might be relieved on the ground of fraud and deception, or acting under a wrong impression. Surely the State ought not to stand in any worse situation, Suppose the secretary was authorized to issue a grant for 25,000 acres from the warrants, and from the courses and distances he grants 69,000. Having acted under a wrong impression he was deceived and the grant is void. The governor and secretary were only attorneys or agents for the State. They had no authority by law to grant more than the amount of the warrants, nor any authority to grant on satisfied warrants at all. Suppose one man gives a letter of attorney to sell 1000 acres, out of a tract of 10,000 acres; and instead of 1000 he sells 2000 acres. The execution is voidin toto. The excess cannot be separated. Precisely similar is the situation of the secretary and governor. They are nothing more than the attorneys in fact of the State; and so long as they conform to the law, which is their letter of attorney, their acts are good, but not otherwise.
It has been urged that this deception did not arise from any act of the grantee, and therefore he ought not to be affected by it. Can it vary the case, particularly as it respects the public interest, who brings about the deception? The effect is the same, and it ought to be left to the jury. Has not the State been defrauded? Surely the Court will not let a person avail himself of his own wrongs. This would not only be repugnant to a plain maxim of law, but to an obvious dictate of morality, of justice, and of sound policy.
Every person ought to be interested in the detection of fraud: it is just; it is sound policy.
It has been said in argument that it has been frequently decided that county or fifty-shilling warrants might have been surveyed and granted *Page 29 
within John Armstrong's bounds agreeably to the laws of North Carolina. If it has been decided ever so often, I am bold to say, it was wrong. The position assumed is, that no grant on Carter's or any other county warrant for land, within the Middle District, is valid under the laws of North Carolina. A reference to the act of the legislature will show this. The Act of November, 1777, c. 1 opened the county offices, the ninth section declares that all grants not obtained agreeably to the provisions of that act shall be void. This act was suspended by the Act of June, 1781, c. 7, and the Act of April, 1783, c. 2 revived the Act of 1777 within the limits of the State, except such part as was within John Armstrong's bounds. The Act of 1777, § 4 directs that each person shall take the oath of allegiance, and pay the consideration money before making the entry. The Act of April, 1778, c. 3, § 2, provided that if on survey the quantity contained in the entry could not be had, the entry takers were required to refund, of the purchase-money, in proportion to the land lost. This act respected county entries alone, and it was the intention of the legislature that if an enterer should lose his land by older claims, the money should be refunded, and not that the claim might be removed. This was the law when the Act of 1777 was revived by the Act of 1783. The plaintiff claims under a grant founded on removed county warrants.
We will therefore examine the doctrine of removals, and see whether from the acts it applies to county warrants. To me it appears evident that the acts of the legislature of North Carolina were never designed to authorize the removal of county warrants. Admitting for a moment that they did, the Cession Act repealed them, 1789, c. 3. The Act of April, 1784, c. 14, § 7, is the first law respecting removals. This act manifestly contemplated John Armstrong's claims alone, as will appear from the caption and general scope of the act. The Act of October, 1784, c. 19, § 6 is the next in order on this subject. This section speaks of entries made by virtue of a law commonly called the land law; it authorizes the removal of such entries when taken or lost by better claims. What, I ask, was the law *Page 30 
commonly called the land law? It was the different acts respecting John Armstrong's office, or the western lands. It did not refer to the county claims at all.
The next and last act of North Carolina on this subject is the Act of 1786, c. 20, § 7. This in express terms refers to John Armstrong's claims. So that no doubt can exist on this section, whatever may take place as to the two previous acts.
He admitted that the language of the two first acts was general, and not confined to any species of claims; but it was manifest from the caption of those acts, as well as the reason of things, that the legislature designed to confine removals to John Armstrong's claims. Particular limits were allotted for entering lands in John Armstrong's office; those lands were sold at ten pounds per hundred, and the county claims at fifty shillings per hundred. By the Act of 1783 for opening John Armstrong's office, the county offices were abolished within his limits. In this we see a demonstration of the care of the legislature, in keeping those claims separate and distinct. And we have no reason to believe that the legislature changed its disposition afterwards in this respect. It would be absurd to suppose that the legislature would permit fifty-shilling warrants to be carried into the limits of the country where it sold land at ten pounds per hundred. If this had been the case, there would have been but little land left to satisfy the ten-pound claims.
Until the year 1791, the legislature of North Carolina always conceived that those who had entered lands in the county offices, and had lost them by better claims, were to be made whole by the State refunding the purchase-money. In that year the law was altered. All the laws respecting removals passed in the year 1784 and 1786. At this time John Armstrong's office was shut, and no more claims could be entered in that office. The legislature, by shutting the office, supposed, no doubt, that all the lands fit for cultivation within the bounds allotted had been entered; could it then be possible that the legislature would authorize the removal of county claims within those limits? There were county *Page 31 
claims sufficient to swallow up the whole of the lands within John Armstrong's limits in a little time. And if not enough then entered, there was nothing more to do than pay fifty shillings per hundred into the county entry taker's office, for any county in North Carolina, enter the lands that were previously entered or granted, and then remove the warrant, within John Armstrong's boundary, to Holston, Tennessee, or Mississippi. But suppose that these statutes authorized the removal of county claims, still I insist that the act usually called the Cession Act, 1789, c. 3, § 1, provides only for John Armstrong's and military claims. This act contains the terms of a contract between North Carolina and the United States; and, so far as these terms are repugnant to pre-existent laws of North Carolina, those laws are thereby repealed. That removals were confined to western lands or John Armstrong's, I rest on three grounds, — 1st, As to county entries the money was to be refunded by the State when the land should be lost; 2d, That the laws authorizing removals were made in relation to John Armstrong's claims, and not those of counties; and 3d, If those acts do authorize the removal of county claims, they are repealed by the Cession Act, 1789, c. 3, § 1.
Though there may have been decisions, if the Court perceive an error, it will correct it.
It has been urged that none but the State can avoid a grant. To refute this doctrine, I trust to reason, but I can prove it erroneous by authority. The ninth section of the Act of 1777 is clear on this ground. Any grant, says the act, that shall be obtained otherwise than agreeably to its provisions shall be void. How, it may be asked, is it to be void? If void as to the State or any individual, it is so as to all. That act requires sworn chain carriers and a surveyor. If this is not complied with, it is an evasion of the act, and the grant is void. Can a survey made by Gordon, Donnelson, or other private individuals, be good? They were not subject to the responsibility which the State designed. They had never given the bond and security required by law. The Acts of 1777 and 1783 forbid the emanation of grants for greater quantities than 640 acres in the one case, *Page 32 
and 5000 in the other. Here is a grant for 32,000 acres,' and the grant is void on this ground. There never was an act which authorized the consolidation of warrants, except for swamp lands in the lower part of North Carolina, April 1784, c. 19. It was the policy of the law to discourage large grants, as excluding the poorer classes of men from acquiring lands. And as the grant in this case is founded on county warrants, which could not exceed 640 acres, as there was no law to authorize a consolidation, the grant for 32,000 acres is in fraud of the provisions of law; and consequently void by the ninth section of the Act of 1777. By the principles of the common law, fraud vitiates every thing: nothing is excepted from its deleterious qualities. Even the judgments and decisions of courts may be avoided on this ground. Surely the Court will permit the disclosure of the fraud which is alleged. If it will not, it will be for ever buried, and thus the Court will become accessory to it. It is said, and generally believed, that fraudulent grants have covered a considerable part of this country. Is there to be no relief? Justice would be outraged by such a course of procedure; and its courts, instead of affording redress to the injured and oppressed, would become an asylum for fraud, wickedness, and depravity. It is believed, by those best acquainted with land claims, that grants have been fraudulently obtained for not less than five millions of acres; as, for instance, fraudulent transfers; fraudulent certificates of the service of soldiers; upon forged transfers; and on warrants previously satisfied, beside many grants without any warrant at all. Is there to be no relief, either for the State or real owner? In this republican country, is it not much better that these frauds should be inquired into than the rights and morals of men should be injured by their being buried? Let this be the case, and we should be oppressed with lordly owners of immense quantities unrighteously obtained. The poor, as well as the rich, should at least have a fair and equal opportunity of obtaining justice. This never can be the case, where the cunning and fraudulent are suffered to keep that which they have obtained in evasion of the laws of their country. *Page 33 
This course certainly will injure the fewest people; for but a few have purchased under these fraudulent grants but had some idea of it, and generally gave but a small consideration.
To conclude, if I am permitted by the Court that, instead of this grant issuing on ten-pound warrants, as it purports to have done on the face of it, it really issued on fifty-shilling warrants, and, admitting these were county warrants, that they had been previously granted.
All this I can show, if the Court permit the evidence to go to the jury. Let us have it to say, what the imperious calls of conscience and justice require, that, in Tennessee, the fraud on which a grant issued was not privately buried and covered up, but laid bare, dissected, and openly exposed in our courts. The honor and credit of our country require that it should be done. Does not the law of England support us in this course? In 2 Bl. Com. 348, the author observes, "when it appears from the face of the grant that the king is mistaken or deceived, either in matter of fact or matter of law, as in case of false suggestions, misinformation, or misrecital of former grants; or if his own title to the thing granted be different from what he supposes; or if the grant be informal; or if he grant an estate contrary to the rules of law, — in any of these cases, the grant is absolutely void."
The same rules apply to the grants of the State. A court of law, in this country, is the only court that can inquire whether a grant be void or not. In England, the validity of a grant must be inquired of by a jury.
We do allege a false suggestion, and the Court surely will inquire whether it be the case or not.
WHITESIDE, e contra. — This grant is not void, but if it was, the defendant, having no title, ought not to put us on the inquiry. In England, if the claims of two persons come in collision they may be examined, but denied that the doctrine proceeded the length contended for. In England, the method of avoiding a grant is for the government to permit an *Page 34 
individual to use the name of the king. He asked if the defendant could come into court, without any title, and use the king's name? Would this be allowed agreeably to the English law? He conceived not. The passage read from 2 Blackstone, 348, does not apply to the grant before the Court. The book says, where it appears from the face of the grant that the king is deceived by misrecital or false suggestions, recitals are always the suggestions of the grantee, and the false suggestions mentioned are those misrecitals.
This is the form of a grant in England, except where it is made on the king's mere motion, and contains no recital. None of the grants of the State of North Carolina contain recitals. Ours is in the usual form. The law in Blackstone is not therefore apposite. As to removals, he understood the question at rest. It was decided in the case of Dodsonv. Findley and Cocke; and in the case of Jackson's Lessee in Jefferson county, the doctrine was recognized.
Suppose these were county warrants, the consideration from the State, viz., £2 10s., was, in value, more than the consideration for John Armstrong's lands, where £10 in certificates were given.
These certificates might be bought at the time the lands were entered for two shillings in the pound. In the Cession Act, the legislature made provision for every kind of claim. And North Carolina and Tennessee have admitted this construction, having acted according to it in issuing grants. This construction was acquiesced in by Congress, and even confirmed by its compact with this State. There is not any prohibition in any of the statutes of North Carolina against granting more than 5000 acres in one tract, and therefore the grant is not void for that reason.
The legislature of this State has had the subject of large surveys on consolidated warrants under its consideration. In the year 1806, a law was passed for clipping them. At the next session, the legislature repealed this part of the land law; and will the Court now undertake to say that which the legislature thought could not be done? *Page 35 
HAYWOOD said he would, with the permission of the Court, read an authority which would prove that a person in possession, without title, might except to the legality of a claim set up against him. He then read Legate's case, 10 Co. 112. The contest in that case was by a person who had not any title.
[1] See the case of Polk v. Wendel and others. In Carter's office, the entries and warrants were not in numerical series, and hence the invalidity of the claim cannot be ascertained on that ground; and as the entry books in that office have been lost, there is no evidence of record but the files of warrants in the secretary's office of North Carolina.